320-224-WC Emerald Performance Materials Appellant by Mark Cosimini v. Illinois Workers' Compensation Commission, Glenn Goddard-Apolli by Timothy Shea. Mr. Cosimini, you may proceed. Thank you, sir. May it please the court and counsel, my name is Mark Cosimini and I represent Emerald in the case. This is a chemical exposure case filed under the Occupational Diseases Act. The commission awarded benefits and it's our contention the decision was contrary to the manifest weight of the evidence. Now, generally, the commission gets to make credibility determinations, but it's not allowed to base its decision on speculative information or unreasonable inferences, which is what we're contending here. Now, the commission decision was essentially the arbitrator's decision and the very first paragraph of the arbitrator's decision kind of sets the tone for what I would consider to be a sloppy and irrational analysis. The very first paragraph says the claim is based on exposure to six different chemicals, which manifested October 28, 2011. Well, it was actually based on two chemicals and the manifestation date was changed to November 16, 2011. So I think that kind of sets the tone for where we're going with this. The evidence actually shows the condition manifested itself in mid-May of 2011, which was two months after the claimant stopped working for Emerald. He reported at the end of May of 2011 that he gained 40 pounds in the previous two weeks, which means it was an acute condition, which developed two months after he stopped working for the employer. So I think the easiest way for me to go through this to kind of go through the commission's decision. This one was fine on the glass. Oh, I'm hearing noise in the background. I think that's from our clerks. So our clerks will turn off their mics. Okay. Thank you, Mr. Grossman. Sorry about that. No worries. No worries at all. In the accident section in the conclusions of law, the commission cites to the Freeman United Coal Mining case to support a standard that the claimant is not required to show proof of the amount, time, and duration of exposure. Well, first it's a coal miner case. And the claimant in that case had pneumoconiosis, which can only be contracted from coal dust. And the Supreme Court in that case said, the guy spent 33 years in the mine. He's got the coal miner's disease. They didn't need any more information to establish causation. That was enough as it was. That doesn't apply here where the condition is membranous nephropathy, which is not only contracted by the people at Emerald or exposure to the two chemicals mentioned, morpholine and carbon disulfide. So not to mention there's no other workers at Emerald that have this condition. So that same standard wouldn't apply to this case. There has to be some evidence to establish that the membranous nephropathy is an occupational disease. Also, can we hone in on what I think is the claimants? Apparently, Dr. Spiro, Conaburn, Desai disagreed. But the commission, as you noted, the arbitrator adopted a testimony of Dr. Fletcher. So what's wrong with Fletcher's opinion? All right. There's a whole list. Let's start with... Maybe you could go with the short list and tell us what was right with his assessment of the case. Dr. Fletcher correctly named the diagnosis. Okay. Outside of that, I can't really give him a whole lot of credit. The commission mentioned several reasons why it was relying on Dr. Fletcher's opinion. The first was that he examined Mr. Goddard and had more time to examine, evaluate, and treat him. Presumably more time than Dr. Conaburn and Dr. Desai. But with that analysis, with that criteria, Dr. Spiro, by far, is the most qualified to render an opinion. He was the treating doctor. He's a kidney guy. He's the one with the opinions, with the opinions that matter. Well, he diagnosed Mr. Goddard with primary membranous nephropathy, which is idiopathic, not secondary membranous nephropathy. He maintained that primary diagnosis after the biopsy was done and after it was provided with the material safety data sheets. I can't emphasize enough, on two occasions, he filled out claim disability forms where he wrote the condition was not related to the work exposure. So if you're going to compare which doctor, I mean, I think this case is more than just which doctor to believe, but I think that's a pretty influential piece of evidence. The commission also said Dr. Fletcher relied on the medical literature in contrast to Dr. Conaburn and Dr. Desai who didn't. Dr. Fletcher acknowledged that the cases he was relying on don't even mention the two chemicals that we're dealing with. So I'm just shaking my head at how the commission can find medical literature persuasive when it doesn't even mention our chemicals. Dr. Tapp, who did the health hazard evaluation, which by the way, was commissioned by petitioner, his union, and Dr. Fletcher, said there is no credible literature supporting a connection between morphine and carbon disulfide and kidney damage in humans. The commission also pointed to Dr. Fletcher having a better understanding of the plant conditions and chemicals. One of the reasons that they say he had a better understanding was that he visited the plant. Now, he didn't visit the plant like Dr. Tapp did, where he went inside and took surface samples and air samples and reviewed documentation from a plant. He stalked the plant from 50 yards away. Now, if that gives him an edge in causation, I guess I'll send all my IME doctors to the employer's facility and just stand outside. That gives him no extra credibility or no information whatsoever. The commission pointed to Dr. Fletcher's communication with NIOSH. They're the ones that did the health hazard evaluation that he commissioned. His only communication with them was to try to convince them to change their opinion. He was trying to convince them that there is a causation, and they completely disagreed. The NIOSH report expressly states there's no causation. The NIOSH report also, correct me if I'm wrong, found that the levels that they tested for were all within the range of safety. They were in the safe range. That's correct. There were no overexposures of morphine or carbon disulfide. Let's see. In the commission's decision, it completely discounted Dr. Sparrow's opinion, saying that he never rendered an opinion, except he did with the primary membranous nephropathy diagnosis. That is an opinion, not to mention the two different claim disability reports that he completed expressly stating there's no causation. In its decision, in the conclusions of law section for causation, the commission didn't even mention the health hazard evaluation, which commissioned by Dr. Fletcher. I kind of equate this to if I have an IME done and it sides against me, everyone's all open arms that I would try to argue against my own doctor. Well, the same should apply here. This is Dr. Fletcher's chosen expert. This is who he went to to get information. They said there's no medical literature that supports causal connection. They said there's no causal connection between any workplace exposures and the workers with kidney problems, which Mr. Goddard falls into that category. There's just no information here whatsoever to rely on that's credible that would establish a causation. Dr. Fletcher testified that in rendering these causation opinions, you need to know the frequency, duration, and intensity of exposure. Well, he had no information as to the intensity of exposure. There's no evidence as to how frequent the exposures were. By his own criteria, Dr. Fletcher can't render an opinion on this. That's why I said this isn't just a matter of which doctor to believe. Other than Dr. Fletcher's testimony, every other piece of evidence is either irrelevant or contradicts a causal connection. Then I'll just move on down. There's the permanency award for 40% of a person. Now, membranous nephropathy is a condition where protein leaks through the kidneys and into the urine, leaving the body with an insufficient amount of protein. Well, Dr. Fletcher acknowledged at trial that Mr. Goddard had a full complement of protein in his system because he was in remission going back to the end of 2012 or 2013. Any issues that he had isn't from deficient protein levels. It's not from the alleged work-related condition. Any limitations or symptoms he has can't be related to the alleged work condition, which means there can't be any permanent disability. Then finally, the TTD and the medicables, it's like a logic game. All right, the manifestation date is claimed to be November 16th of 2011. The application was actually filed six days earlier, November 10th, 2011. So, I'm not sure how you can have an application unfiled before the accident date, but that's what we have here. So, I'm not sure how you can award medical bills or TTD from before the manifestation date, which is exactly what happened here. So, that, at the very least, has to be stricken. Well, wait. The application was filed November 10th, 2011, and then at trial, it was changed to November 6th. I mean, the manifestation date was changed to November 16th, 2011. There's never been an application filed after that time. So, if the November 16th, 2011 is the date of disablement, then we have a statute of limitations issue. I guess you can bring up jurisdiction at any time. I'll bring it up now. I think there's no jurisdiction. I'm thinking, when we file an arbitrator issues a decision, and then there's a petition for review filed, if the arbitrator issues a corrected decision, you have to file another petition for review after that. So, I think another application had to be filed here, and it wasn't. I think we have a statute of limitations problem. I think there's no jurisdiction. Go figure. I think that that's the crux of my arguments. I mean, obviously, the biggest issue here is causation, and there's... Maybe what can come to you when you're waxing eloquently, huh? That's amazing. We've been doing this case for 10 years, and now I get a brilliant idea. Thank you. I think I'm asking that the decision be denied in its entirety and dismissed, and all benefits denied. Thank you. On a basis of a lack of jurisdiction? Is that the crux of your argument? Sure. Starting with the lack of jurisdiction, and if you think there is jurisdiction, then there's no occupational disease, and if there's an occupational disease, there's no causal connection. So, strike three. Okay. Thank you. While you have remaining time, do you want to summarize each point? Okay, sure. Well, okay. Going to the occupational disease part of it. Yes. All right. The commission talks about... Well, the commission incorrectly states that the health hazard evaluation found an overexposure to morpholine and carbon disulfide. That's not accurate. What they found was that there was some overexposure to curate powder. Now, morpholine and carbon disulfide are components of the curate powder, but I equate that to hydrogen, oxygen, and water. Obviously, the risks are different if you light a match in a room full of oxygen or a room full of hydrogen compared to lighting a match in a room full of water. That's the same thing here. Now, exposure to the curate powder, let's presume carcinogen. So, if Mr. Goddard would have been diagnosed with a certain form of cancer, we'd be having a different discussion. He was diagnosed with membranous nephropathy, which is in no way related to the curate powder, which was the only component or chemical thought to have an overexposure to the workers. Well, the curate powder is composed of those two chemicals. Am I correct? Among other chemicals, yes. Yes, but the two chemicals are present in curate powder. Correct. And you're saying there's no medical link between those two chemicals and the condition of the patient? There's no literature to support it. It's supported by everyone except for Dr. Fletcher. Okay. And then your jurisdiction argument summary? The manifestation date was changed to November 18th, I think, of 2011. And assuming that's the date of disablement... November 16th, 2011. Thank you, sir. November 16th, 2011. Assuming that's the date of disablement, which would make sense because the TCD began with the initial manifestation date. The commission didn't change the date from October to November. But assuming the date of disablement is the manifestation date, then there's no application on file within three years of that date of disablement. The statute of limitations in the Occupational Diseases Act is three years from the date of disablement. So if the TCD date is supposed to be the manifestation date is when it starts, that's a date of disablement. There's been no application filed since then. So we have a statute of limitations issue. I think that summarizes it. Any questions from the members of the court? Other members of the court? Was there a third issue he was going to summarize? Oh, causation. I think I've touched on that. I just don't believe there's any real credible evidence to support Dr. Fletcher's opinion. All the credible evidence comes from the health hazard evaluation and the main treating doctor, Dr. Sparrow. I mean, of course, we've got our IMEs who say there's no causal connection. Dr. Canterbury, she simply relied on... She's an occupational medicine doctor and she just relied on the health hazard evaluation. So that's just support for the health hazard evaluation. Dr. Desai is a kidney specialist and she reviewed the biopsy, which is what Dr. Fletcher really relied on. And she rendered an opinion that the biopsy findings were more consistent with a primary membranous nephropathy as opposed to a secondary. So those are causation arguments. Mr. Kosemany, you'll have time to reply. Thank you very much. Mr. Shea, you may respond. Judge, thank you. May it please the court, counsel. I'm going to start off with this jurisdictional argument right away. We have filed on a timely basis. His last employment, I believe, was in 2011. We certainly have filed within that appropriate time. A manifestation date by its very definition is the date on which the claimant would have reasonable knowledge to know not only of his exposure, but the relationship to the exposure. Given the fact that we filed an that there's a jurisdictional issue, quite frankly, the arbitrator and the commission have the power to change the date of accident based upon the evidence presented to it. So it has changed the manifestation date to the date that the claimant saw Dr. Fletcher, which is really the appropriate date. And the filing of the application for adjustment of claim preceding the manifestation date does not render a jurisdiction argument. In fact, we have timely filed the application for adjustment of claim. And if I may use as an analogy, a carpal tunnel syndrome case, a person may experience carpal tunnel syndrome, not realizing that they have a work related occupational disease. And until they see a doctor ordinarily after an EMG, and depending upon the timing of these particular medical visits, it may be after the symptoms and after the time that the petitioner started missing work. It all deals manifestation date usually relates to a date when the claimant has seen a position who clarifies the relationship of the exposure to the condition of ill-being. So there is no jurisdiction argument here. And what I have found most interesting about this case is that when we talk about exposure, there's absolutely no evidence that contradicts exposure. We have testimony, not only from the petitioner, but we have testimony from another employee. The respondent did not contact or call any employees to dispute the exposure to the two primary chemicals, which are carbon disulfide and morphine. And there's absolutely no evidence. There's no evidence to dispute the fact that there was exposure by the claimant due to skin absorption and breathing. In fact, their own expert witness, Dr. Conover says, if you can smell it, you're exposed to it, even with the respirator. She agreed with that. The inadequacy of the protective equipment is not disputed as well. I think it's important to realize that he had a special type of helmet to accommodate a condition that he had, and he could smell the chemicals. He testified, he could smell several of the chemicals, including the morphine, which is one of the two important chemicals. The NOMAX fire retardant uniforms not successful keeping the dust off of him. And that's what's important is because the exposure really is from a product that's called PureRite 18. And even if we look at the NIOSH documents, they indicate the overexposure to two people because of the dust from the chemicals, even in that document where they had the opportunity to clean up the plant, there still was an overexposure to that. Can I reflect the question here that I wish you could answer, could address? Sure. Mission, in relying on Dr. Fletcher's testimony, noted that he said, in assessing the occupational disease cause, it is very important to look at the frequency and intensity of the exposure. However, then they did not address his additional testimony. Fletcher said he lacked sufficient information to determine the intensity of claimant's exposure to any specific chemical. And specifically he said, we don't know the intensity because we have limited industrial hygiene data. So does that not go to the argument there's a fundamental flaw in the foundation for his opinion? No, it doesn't. The testimony from the petitioner and from Mr. Smith talks about the, I guess you could call the intensity of the exposure and the condition of the mesangial deposits verified. We have the ultimate condition of well-being, which is the secondary membranous nephropathy, which in and of itself verifies that there was sufficient intensity, frequency, and duration. We have to remember- Who testified to that, that in and of itself verifies that? Who testified to that? Who testified to the frequency? You just said. Certainly the frequency was testified to by the petitioner with the exposure. He worked primarily in building 725. This is where this product was made. He worked, I think he said he worked 600 to 800 hours of overtime in his last year before he stopped working. He may have said that, but Fletcher says specifically it's important that we look at the frequency and the intensity of claimant's exposure. Fletcher did not acknowledge he couldn't address that element because he didn't have the right information. He didn't have industrial hygiene data. And if there was a necessity of the industrial hygiene data with every exposure case, there would never be an exposure case that could be won by a claimant. That's what he was missing, the industrial hygiene data, and he didn't have it, but certainly there was sufficient exposure with as far as intensity to cause the condition of well-being. That in and of itself describes or at least verifies. If the doctor would have testified and said, but I relied upon the intensity that was related to me by the employee, then we've got a foundation. But you can't turn around and say it's intensity because he wound up with the condition. There's no evidence in this record that everybody that winds up with this condition gets it from overexposure to these two chemicals. Absent some reliance on some intensity testimony, he does have a foundational problem, it appears. I believe that Dr. Fletcher stated that it was his testimony based upon the exposure, the duration. He didn't have exactly the industrial hygiene data. And what he said was most important was the fact the presence of the mesangial deposits that differentiated between primary and secondary. And certainly he showed a study, exhibit number 58, which demonstrated the morpholine being positive of the increase of proteinuria, which is the basis of how secondary membranous nephropathy is created. The fact that he didn't have the exact industrial hygiene data, I guess you could take a look at the NIOSH study where they said there was overexposure to the Otis among the two employees. There was the leaking, there was the ductwork issue, there was the not having the proper protective equipment. I don't believe that this is a fundamental flaw in the basis of Dr. Fletcher's opinion. Mr. Shea, what did Dr. Fletcher say was the intensity and duration of exposure? Well, the duration was from 1993 to 2011. That's when he was employed there. The, he had worked by his own admission in building 725. And what did Dr. Fletcher say was the intensity and duration of exposure? Not what the record says. What did Dr. Shea say, or Dr. Fletcher, excuse me, say to get back to Justice Hoffman's observation about a foundational issue? Dr. Fletcher testified. I don't recall specifically what he said about the duration. He certainly met with the employee. He got the history of not only the fact that he worked at that plant from 1993 to 2011, he also had the history of the he had a history of the types of exposures that he had from the patient, the fact that he breathed this powder. As far as how many times a day he breathed this powder, he didn't specifically state that. So if we look at this medical history, we'll get all of that, that Fletcher said he reviewed or took. Well, you can look at his medical records of the history that he took. It's contained in there, which is part of his exhibit, which are the SafeWorks records. Am I not, am I incorrect in my reading? My understanding was that Dr. Fletcher specifically stated he did not have intensity or duration information when he based his opinion on causation. I don't think he said anything about duration. He didn't have that information. What he said about intensity is he didn't have the industrial hygiene data. That's all he said. I mean, that's the point. I mean, if we're relying upon whether somebody can prove a case by whether they have industrial hygiene data or not, since there's no discovery in a worker's compensation claim, nobody could ever prove that. It doesn't, you don't have to have industrial hygiene data to talk about the frequency or the intensity of the duration. The frequency is this man worked in building 725. The last year he worked 600 to 800 hours of overtime. And we certainly had, and the product that was manufactured in this particular building was two products, BBTS and the Curide-18 product. That is evidence that was relayed to Dr. Fletcher as far as sufficient intensity or exposure to these two chemicals, which make Curide-18 morpholine and carbon disulfide. Now let's go to the next step. So what intensity and duration of these two chemicals, which make up Curide-18, where's the evidence that it creates the condition of ill-being? The evidence is the biopsy. That is the distinguishing medical record. What does the biopsy show? The biopsy showed the presence of mesangial deposits. A biopsy shows the presence of a condition, but where's the link between exposure and the existence of the condition? Dr. Fletcher said that the exposure created the immune response, which led to the deposits that we're seeing in the biopsy itself. So the two chemicals create an immune response. They create a trail, so to speak, leading to this condition. Is that correct? Or are they a combination leading to the condition? Okay. Yes. Okay. All right. And what is that foundation for that link that this trail, so to speak, actually creates the condition? What did he base that on? Well, he based it upon his experience as an occupational medicine physician. He also referred to exhibit number 58, which was a study that was done that reflected that this morpholine is responsible for this type of condition. So there is a study. There is the particular exposure to morpholine and to carbon disulfide created this immune response. And as a board certified orthopedic surgeon who's worked in the past, he has the basis to render these opinions and the foundation by his review of the medical records, his review of the MSDS sheets and recall all these MSDS sheets, the morpholine and carbon disulfide actually say they can cause damage to kidneys. And even Dr. Desai, in spite of the letter that was written to her, asking her to fill in the blanks to present a basis for Mr. argument, even indicated that there can, that the, let me get exactly what she said. So I don't misstate her. Give me a second here. She admitted that carbon disulfide MSDS sheets can affect the document. She also admitted that Ms. Angel deposits can be evidence of secondary disease. So she admitted that. And we all know how her, it took a while to extract the relationship to Mr. Cozzamini. At first he said it was an acquaintance. And then when I asked who was the acquaintance, then we got the name of her brother. Then we asked where her brother worked. And then we found out he worked, he was a partner with Mr. Cozzamini's law firm while he's objecting to all of this, which is clearly appropriate testimony to, to reflect his bias. And then I was able to obtain Mr. Cozzamini's letter, which basically didn't say, can you please give me opinions? It said, give me evidence to support these opinions. Okay. Uh, your time is up, Mr. Shea. I'll let you go over. Thank you. Sorry. Thank you. All right. We gave some extra time to Mr. Cozzamini too. So we're trying to be fair here. Mr. Cozzamini, you may reply. I guess if you don't have the facts and the law, you just say the other attorney is doing improper things. Um, the biopsy does not show causation. You, your honors sort of alluded to that. It shows a condition which the person interpreted the Dr. Harris. I think it was who interpreted the biopsy is the one who was on the report. So is it suspicious for a secondary cause? Well, I guess I'm glad the commission doesn't do criminal work because suspicious is generally not to make a causation. Isn't suspicious circumstantial evidence potentially in this context? Well, I guess it can be, but suspicious of what secondary cause, you know, an occupational disease. I mean, Dr. Fletcher said he makes that leap from a suspicious secondary cause to two particular chemicals, which by the way, are different than the five chemicals he set forth in his second report and different than the five chemicals he set forth in his third report, which was issued three days before trial. So to say that Dr. Fletcher is any sort of an expert, he can't make up his own mind. So I suppose, I suppose my problem with that argument is that if you were, and I were to make that leap, uh, you know, it might be a problem. This is a medical doctor in his field. Isn't this what we rely upon our medical experts to do for us to explain what the biopsy means? Well, not when it gets to the causation argument where he's relying on this literature, which doesn't even mention the two chemicals in question. Now, Mr. Shea mentioned this study that, I mean, we, we started off at Dr. Fletcher testifying live at trial and we didn't finish. So went to his office two weeks later and we finished it. On rebuttal during the testimony there, he comes up with this Chinese study, which gives the same fatal flaw, no information as to the extent of the exposure. And now he's saying, okay, so now there's literature out there. Well, when he said he didn't have the industrial hygiene data, that's when he ordered the health hazard evaluation, which was conducted and came back with industrial hygiene data, which he just didn't agree with. He didn't, he didn't like the results. So, you know, I, I guess he just ignored it. Doesn't the, uh, doesn't the Chinese, uh, um, study also, uh, lack, I mean, it says that the article doesn't specifically mention membranous nephropathy as a renal injury suffered by any of the patients in that study. Yeah, that's accurate. It was, I don't think it was exactly the same condition that Mr. Goddard has, but it was the same chemical, which was different than all the other studies that Dr. Fletcher cited. But once again, there's no indication in that study what the levels of exposure were, what the frequencies or intensities were. But can't that be introduced in, uh, the other evidence because we're not here looking for a foolproof causative relationship, isn't that to be decided by, by the doctors, isn't that to be decided by the commission? Well, I think it's broader than that. If this one particular thing, if you're going to say this one Chinese study is the evidence to make, to say it's not against the manifest way of the evidence, I just disagree with making that leap. You know, what's wrong, what's wrong with making that leap? Well, it doesn't establish causation between the frequency and intensity of the exposure experienced by Mr. Goddard and his condition because it doesn't give that information. Well, what does the study say? It's, it's basically that there were some workers who had some exposure and some had this condition. Okay. Without any of the details that Dr. Fletcher says are necessary, meaning the frequency and the intensity, you know, the duration is fine. He worked there for a long time. So duration is fine, but you don't know whether, I mean, these exposures were from presumably from leaks. We don't know if there was a leak every day, every week, every month, every year, you know, they said it was a lot, but we don't know. That's not in the record. The same with the intensity, you know, did it not come off his got some evidence building seven, what is it? 25 years hours. So there's some evidence of arguably frequency. Isn't it the medical experts that have to tie that up for us? Yes. Okay. Dr. Tap, Dr. Decide, Dr. Conabare, Dr. Sparrow all said, no, Dr. Fletcher doesn't have that information, but he said yes anyway. So the next step is, I suppose you're in a position of convincing us at this point, why it is that those experts Trump Fletcher's testimony, otherwise left with the commission's decision. Well, then I go back to the commission's decision as to the basis for why they adopted Dr. Fletcher's opinions and, you know, standing outside the plant, you know, relying on literature that, you know, doesn't mention the chemicals in question, you know, those kinds of things just don't provide a valid support, a valid basis for adopting Dr. Fletcher's opinions. I don't, Mr. Sheik mentioned that, you know, I didn't present any evidence. Well, it's not my burden of proof. You can't switch the burden of proof here. The bottom line is Dr. Fletcher set forth his own standard, didn't have the information to meet his standard for his criteria. And so therefore he can't render an opinion. Okay. Thank you, Mr. Kosolanyi and Mr. Sheik both for your arguments in this matter. This morning, it will be taken under advisement and a written disposition shall issue.